AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
12/22/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___HC___ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
12/22/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___vm___ DEPUTY

United States of America

v.

LEONARDO PEREZ,

Case No.   2:21-MJ-05716-DUTY

# CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date(s) of August 21, 2021, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1704 | Possession of Counterfeit Postal Key |

This criminal complaint is based on these facts:

Please see attached affidavit.

☒ Continued on the attached sheet.

/s/ Adam Savoie
Complainant's signature

Adam Savoie, U.S. Postal Inspector
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   December 22, 2021

Judge's signature

City and state:   Los Angeles, California

Hon. Gail J. Standish, U.S. Magistrate Judge
Printed name and title

AUSA: Rachel N. Agress (x0487)

**AFFIDAVIT**

I, Adam Savoie, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for LEONARDO PEREZ ("PEREZ") for a violation of Title 18, United States Code, Section 1704 (Possession of Counterfeit Postal Key).

2. This affidavit is also made in support of an application for a warrant to search the person of Leonardo PEREZ, as further described in Attachment A, who there is probable cause to believe is currently located in the Central District of California.

3. The requested warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1704 (Possession of Counterfeit Postal Key), 1708 (Mail Theft and Possession of Stolen Mail), 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), and 1344 (Bank Fraud) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there

is sufficient probable cause for the requested warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5. I am a U.S. Postal Inspector and have been so employed since April of 2019. I am currently assigned to the Los Angeles Division, Alameda Domicile, Mail Theft Team. The USPIS investigates criminal activity surrounding the United States Postal Service as well as violations of Title 18 of the U.S. Code.

6. Prior to my employment with the USPIS, I was employed for ten years by the United States Marshal Service ("USMS") as a Deputy United States Marshal ("DUSM"). While assigned to the USMS, I worked federal fugitive warrant cases, district threat investigations and court operations. Prior to being a DUSM, I was employed by Immigration and Customs Enforcement ("ICE") as an Immigration Enforcement Agent ("IEA"). While assigned to ICE, I worked immigration cases and presented cases for removal hearings and deportations. Prior to ICE, I served with the Houston Police Department ("HPD") for approximately 11.5 years. Prior to HPD, I served four years in the United States Navy (USN).

7. I hold a Bachelor of Science in Criminal Justice from the University of Houston Downtown in Houston, TX. I am a

graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program in Glynco, Georgia.

8. During my tenure as a federal Criminal Investigator, I have conducted and assisted in multiple criminal investigations. I have gained knowledge and experience in conducting investigations involving mail theft, bank fraud, access device fraud, identity theft, and wire fraud. Through the course of conducting these investigations, I have been involved in the use of the following investigative techniques: analyzing financial records, conducting physical surveillance, consensual monitoring and recording of non-telephonic surveillance communications, executing search and arrest warrants in the support of investigations, interviewing subjects and witnesses, and participating in undercover operations.

### III. SUMMARY OF PROBABLE CAUSE

9. On August 21, 2021, Los Angeles Police Department ("LAPD") Officers from the LAPD Rampart Station responded to a 911 call regarding a suspect, later identified as Leonardo PEREZ ("PEREZ"), who had been breaking into cars at an apartment building located at 1515 Wilshire Blvd., Los Angeles, CA (the "Wilshire Building").

10. When the Officers arrived, a Wilshire Building employee, S.R., told them that PEREZ was in the building parking lot in a white Subaru. The Officers detained PEREZ and conducted a pat-down. Records checks revealed that the license plate on the white Subaru was stolen, that the car was stolen, and that PEREZ had an outstanding felony warrant.

11. Officers arrested PEREZ and searched the white Subaru. The Officers recovered the following items, among other things, from the car: a key in the ignition with a keychain containing five counterfeit U.S. Postal Service arrow keys; over 350 pieces of opened and unopened U.S. Mail bearing names other than Leonardo Perez; and multiple electronic devices and luggage. In a fanny pack that PEREZ was wearing across his chest, Officers recovered five additional counterfeit arrow keys and an arrow key template, among other items.

## IV. STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own involvement in the investigation including conducting interviews and other investigatory steps, I am aware of the following.

**A. LAPD Officers find PEREZ inside a stolen vehicle (white 2016 Subaru Crosstrek) in the parking structure located at 1515 Wilshire Blvd., Los Angeles, CA**

13. On August 21, 2021 at approximately 5:30 p.m., PEREZ approached the garage in a white Subaru and using the intercom, and asked to be buzzed in. PEREZ stated to S.R., a Wilshire Building employee, that his parking structure "clicker" was not working. S.R. recognized PEREZ as a suspect who had previously broken into the parking garage on at least two other dates. S.R. provided PEREZ with access to the garage, telling PEREZ to park in the garage while S.R. attempted to fix his clicker. S.R. notified building security and called 911.

14. At approximately 5:45 p.m., LAPD Officers responded to the 911 call at the Wilshire Building regarding a suspect, later

4

identified as PEREZ, who reportedly had been breaking into cars at the Wilshire Building. When they arrived, the Officer found PEREZ sitting inside a white Subaru parked in the garage.

15. Officers gave PEREZ commands to exit the vehicle, detained him, handcuffed him, and conducted a pat-down for weapons. PEREZ denied any wrongdoing. A want and warrants check on the white Subaru's California license plate 7GDZ723 revealed the plate was stolen. A plain-view look at the passenger seat and search of the glove box revealed that the registered owner was not PEREZ. The Officer also looked in the center console and found a drivers' license in the name of victim, "V.T." A want and warrants check on the VIN of the Subaru revealed that the car was stolen. A want and warrant check on PEREZ revealed an outstanding felony warrant for a violation of California Vehicle Code Section 10851(a) - Driving and Taking a Vehicle Without Consent.

   B.   **PEREZ is Identified as a Prior Burglar**

16. One of the Officers spoke with S.R., who showed the Officer surveillance footage from August 14, 2021, between around 4:00 a.m. and 6:00 a.m. That footage shows PEREZ wearing a black fanny pack around the front of his body, leaving the main lobby of the apartment building, systematically checking the doors of parked vehicles, breaking into cars that were open, stealing personal property, carrying the stolen property back to a white Subaru , and then driving out of the parking lot in the white Subaru.

5

17. S.R. also identified PEREZ as having broken into the Wilshire Building parking garage while driving a different car on August 9, 2021, based on surveillance footage.

### C. PEREZ is Arrested, and the Car and His Person are Searched

18. Since PEREZ had an outstanding warrant and had been inside a stolen vehicle, LAPD Officers Gregorio Rangel and Anthony Zepeda placed PEREZ under arrest for violation of California Vehicle Code Section 10851(a)- Driving and Taking a Vehicle Without Consent.

19. Officers conducted a search of the white Subaru and recovered the following items, among others: property including luggage containing a nametag not in the name of PEREZ; approximately twenty electronic devices and electronic equipment; a U.S. passport in the name of victim, "N.B."; approximately 236 pieces of sealed mail and 113 pieces of opened mail not in the name of PEREZ; and five counterfeit arrow keys on the lanyard keychain that the ignition key was attached to in the vehicle ignition.

20. Officers also searched a black fanny pack which PEREZ had been wearing across his chest and found five additional counterfeit arrow keys and an arrow key template, among other things.

**D.     Inspection and Testing of the Counterfeit Arrow Keys**

21.   I inspected the ten arrow keys and key template recovered from the fanny pack on PEREZ's person and the white Subaru and identified them as counterfeit Postal Arrow Keys and a key template.  Based on my training and experience, I know that arrow keys are distinctively shaped keys used by USPS employees to open mail receptacles such as panels of apartment mailboxes.  Arrow Keys are counterfeited by mail thieves in order to gain access to apartment building mail receptacles and to steal mail.  Based on my training and experience, I also know that mail thieves utilize key templates such as the one possessed by PEREZ to fashion counterfeit arrow keys out of pieces of metal to gain access to blue mail collection boxes.

  

22.   The mail in defendant's car included fifty pieces of mail from another apartment building on Wilshire Boulevard.  On October 20, 2021, management of that building provided me with access to the mailroom.  I inserted one of the counterfeit postal arrow keys recovered from the white Subaru into the mail unit, and it unlocked the unit.

7

## V. TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

23. Based on my training and experience, including being a member of a USPIS Mail Theft Team, and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

   a. Persons who steal mail are often found in possession of counterfeit Postal Arrow Keys. Postal Arrow Keys are used by USPS employees to access apartment building mailboxes. Mail thieves will often trace the outline of a postal arrow key in order to make additional copies.

   b. Persons who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value. Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

   c. It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital

devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

        d.   Often times mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

        e.   It is also common for mail and identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

        f.   It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.

Software relevant to such schemes can often be found on digital devices, such as computers.

      g.  Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

      h.  Individuals engaged in mail and identity theft often use multiple digital devices.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

24.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

10

been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

　　　　d.　Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

　　25.　Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

　　　　a.　Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

　　　　b.　Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

　　26.　The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress PEREZ's thumb- and/or fingers on the

13

device(s); and (2) hold the device(s) in front of PEREZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

27. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

28. For all the reasons described above, there is probable cause to believe that PEREZ has committed a violation of Title 18, United States Code, Section 1704 (Possession of Counterfeit Postal Key). There is also probable cause that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 22nd day of
December, 2021.

_____
THE HONORABLE GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE